Filed 7/21/16  In re S.M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S.M., et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Jennifer Z.,<br><br>        Defendant and Appellant. | A146807<br><br>(Contra Costa County Super. Ct. No. J14-00576, J14-00577 J14-00578) |

Jennifer Z. (mother) appeals from the juvenile court's order terminating her parental rights to her three youngest children, S.M., A.Z., and S.Z.  She contends the juvenile court erred in finding the beneficial parental relationship exception of Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i), [1] did not apply.  Finding no error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 2014, the Contra Costa County Children and Family Services Bureau (Bureau) received a referral of general neglect relating to S.M., then 10 years old, A.Z., then 7 years old, and S.Z., then 5 years old.  It was reported that the children were missing school because they moved frequently, and that the family was homeless and

---

[1] Further statutory references are to the Welfare and Institutions Code.

1

lived in a trailer with no electricity. A Sheriff's deputy familiar with the family confirmed that their trailer had no electricity; he also suspected they were using the yard as a bathroom. Another deputy reported that mother and her boyfriend admitted to using methamphetamine.

The day after the referral was made, a social worker visited the trailer (which had been moved to a new location that day) accompanied by an officer from the Oakley Police Department. They found a fifth wheel trailer with several broken windows. At the front door, there was a strong smell of fecal matter and many flies. There was no electricity, running water, or any way to empty the toilet. They observed swarms of flies, and the toilet was filled to the seat with feces. There were overflowing garbage cans, spoiling food on the stove, and an overflowing sink of dirty dishes and cans. The officer told Jennifer he was going to place a hold on her three children based on the condition of the trailer.

The social worker and police officer then went to the children's school. S.M. told the social worker she had been living in the trailer with her mother and brothers for the previous month, and they had been without electricity and water for a week. A.Z. reported he had not taken a shower in 10 days. S.Z. said he did not brush his teeth because they did not have toothbrushes or toothpaste. The three children were placed in protective custody.

The Bureau filed juvenile dependency petitions on behalf of S.M., A.Z., and S.Z., alleging failure to protect. (§ 300, subd. (b).) The juvenile court ordered these children detained from mother.[2]

In August 2014, the juvenile court sustained the allegations of the petitions.

---

[2] Mother also has four older children. Three of them, ranging in age from 11 to 14 years old in May 2014, recently had been declared dependents of the juvenile court in Lassen County. These older children were found living with their maternal grandmother in unsanitary conditions, which included moldy food in the kitchen and cat feces and garbage throughout the home. In addition, mother's 11-year-old daughter suffered nearly fatal complications from a lice infestation because of the grandmother's neglect. Mother's oldest child was 18 years old and living with her boyfriend and their child.

In October 2014, the Bureau filed a disposition report. Mother had an extensive child welfare history. Her mother (grandmother) had a long history of illegal drug use. In 1994, when mother was around 13 or 14 years old, it was reported that she was in a sexual relationship that was also physically abusive with a man who was over 21.[3] In 1997, mother's oldest child was the subject of a juvenile dependency petition. At that time, mother was arrested for manufacturing methamphetamines, and she admitted that a meth lab found in grandmother's home was hers. Other reports of neglect were documented in 1996 and 2002, but did not result in dependency proceedings.

Mother married the father of A.Z. and S.Z. in 2005, they lived in Mexico for several years, and they separated in 2010. S.M. lived with grandmother when mother lived in Mexico.

More recently in 2012, mother, her boyfriend, S.M., A.Z., and S.Z. lived with her maternal grandfather (great-grandfather). However, great-grandfather reported to the police that five checks were stolen from him beginning in February 2014. Mother's boyfriend tried to cash one of the stolen checks, and another stolen check was found in mother's purse. Great-grandfather stated that mother "stole [his] life" after he let her, her boyfriend, and her three children stay with him. Mother charged over $4,000 on his credit cards. She also stole the pink slip to his car and sold it without his knowledge. Great-grandfather further reported that mother did not care for her children, that she and her boyfriend fought all the time, and that the boyfriend screamed at the children.

S.M., A.Z., and S.Z. were placed together in a foster home. S.M. reported that she lived with her older siblings and grandmother the majority of her life. S.M. did not meet her younger brother, A.Z., until he was three years old. She reported that, when mother left Mexico, she did not bring A.Z. with her, and he stayed with an aunt. During visits with mother, S.M. often cried when she said goodbye. She was concerned about mother's well-being. Mother telephoned the children sporadically, and S.M. often consoled mother during the calls.

---

[3] This man is alleged to be the father of mother's four oldest children.

A.Z. suffered from encopresis for years, and an examining doctor reported the condition was severe and chronic and would likely require a long recovery. A.Z. had experienced trauma and loss, which may have contributed to his condition. The foster mother was instrumental in helping him manage his condition. S.Z. had three cavities, but no medical concerns. The foster parents did not report any behavioral issues for any of the children.

A contested disposition hearing was held in October 2014. The juvenile court declared the children dependents of the court and removed them from mother's custody. The court denied mother reunification services pursuant to section 361.5, subdivision (b)(13), finding, "[t]his was a very profound case of neglect directly attributable to mother's chronic substance abuse issues that have existed for years and years." A section 366.26 hearing was set for February 2015.

In February 2015, mother filed a section 388 motion requesting reunification services. On April 8, 2015, after hearing testimony from mother and a social worker, the juvenile court denied the motion. In support of her section 388 motion, mother claimed she was participating in an inpatient drug treatment program and she "made significant changes in her life." The juvenile court found mother lacked credibility, and stated that she appeared to have participated in drug treatment programs only as "a matter of convenience" to avoid county jail (in connection with the checks stolen from great-grandfather), and not as "a genuine effort to address the issues that brought her and her children before" the court.

In April 2015, the Bureau filed an initial section 366.26 report. It recommended postponing the section 366.26 hearing to allow time to find a potential adoptive placement for the children. The court continued the hearing to September 2015.

At the time the initial section 366.26 report was prepared, the children were living together with a foster family. S.M. was doing well in school, had perfect attendance, and was described as "an outgoing youth with a pleasant disposition." A.Z.'s medical treatment was going well and his self-confidence was increasing as his condition became manageable. He was doing well in school and told the social worker it was nice going to

4

school every day. He was described as "a warm and caring child." S.Z. was in first grade and presented as "an affectionate child who seems to have a close and healthy relationship with his siblings." The social worker reported the three children responded well to the structure and nurturing environment of their foster home, and they were well-behaved, had "a positive outlook on life," and were "a pleasure to spend time with."

The children had supervised visits with mother for an hour every other Sunday. Mother's telephone calls to the children were sporadic until she entered a residential program, when she began calling them several times a week. The social worker reported the children "stated that they would like to live with their mother or at least 'be able to talk to her on the phone.' "

The Bureau determined that mother had failed her children despite having been given several opportunities to address her drug addiction, and recommended that the children were adoptable. While the children had a relationship with mother and they enjoyed spending time with her, the Bureau concluded that S.M., A.Z., and S.Z. deserved more than mother was able to provide. The Bureau was looking for a suitable adoptive family.

In an addendum report filed in September 2015, the Bureau recommended terminating mother's parental rights. The children began living with a prospective adoptive family on September 4, 2015. A.Z. and S.Z. said they wanted to be adopted. S.M. was more hesitant about adoption, which the social worker wrote was normal and age appropriate. S.M. said she felt comfortable in the prospective adoptive parents' home, and she "has expressed a desire to have stability and permanency, using words such as, 'a place to stay forever,' . . . [and] 'my own home.' "

As of September 2015, the children were visiting mother on a monthly basis, and the visits went well. The children were affectionate and told mother that they loved her. The former foster parents observed that A.Z. suffered panic attacks and increased accidents in the days following visitation. No other behavioral changes related to visitation were reported. Mother was given the opportunity to call the children weekly, but she often did not call for three weeks at a time. The children enjoyed speaking with

5

mother when she called, but they did not ask for mother, even when others mentioned her in conversation. The prospective adoptive parents understood the children had a relationship with mother and expressed an interest in maintaining contact with mother, "provided that she remains substance-free, and supportive of the children."

The children were in therapy, and their therapist believed therapeutic contact with mother was not in their best interest. The therapist and a social worker from foster family services, both of whom worked with the children on a weekly basis for over a year, agreed that the children were ready for an adoption plan and that they were not strongly bonded to mother.

The Bureau was extremely concerned that mother demonstrated little insight into her own conduct and minimized her neglect of her children and her 21 years of documented substance abuse. In August 2015, the Bureau learned from the residential program where mother had been staying that she left the program weeks earlier, but mother did not notify the Bureau of her whereabouts. When a social worker was able to contact mother, she claimed she was staying with a friend, but S.M., A.Z., S.Z., and a Lassen County social worker all reported that mother was residing with grandmother, who had significant substance abuse issues herself and had repeatedly neglected mother's older children. The Bureau questioned mother's commitment to sobriety given that mother testified at the April 2015 hearing on her section 388 motion that her drug addiction was result of her upbringing with grandmother and grandmother's drug use was a "trigger" for her own abuse.

The Bureau concluded: "Although the children enjoy time they spend with their mother, they each have experienced the cycle of her coming and going in their life. The children do not have a significant parent/child relationship that would outweigh the benefits of legal permanency."

At the section 366.26 hearing held September 16, 2015, counsel for the children reported that A.Z. and S.Z. loved their prospective adoptive parents' home, and they want to be there forever. S.M. also wanted to remain with the prospective adoptive family, and counsel observed her snuggling with the prospective adoptive mother.

6

Mother did not testify at the hearing. The only witness (called by mother) was social worker Jennifer Lund. Lund testified that the children met the prospective adoptive family at the end of July, and there were a series of visits, including overnight weekend visits, before the children moved in. A.Z. and S.Z. were quick to say they wanted to be adopted, but S.M. never told Lund that she wanted to be adopted. When Lund brought up adoption, S.M. did not say much in response, and Lund described her as "very guarded emotionally."[4] S.M. consistently said she missed grandmother. The children never mentioned mother on their own, and they never asked for more visits with her. When Lund spoke to mother in August, she asked why mother left the residential drug treatment program, and mother did not respond. During the conversation, mother did not inquire about the children and did not ask for a telephone number for them.

The Bureau's counsel argued mother was unable to provide the children a stable home, and stated they were "ecstatic about finally getting a permanent home and having a permanent place that they can rely upon." Counsel for the children supported adoption for all three children. She acknowledged that S.M. was somewhat hesitant to move forward with adoption, but noted that she "certainly [did] not want[] to be removed from this family."

Mother's counsel told the court mother was "struggling with how to address this particular hearing" because she wanted her children to have stability and happiness. Ultimately, however, mother contested the Bureau's recommendation, arguing the children were not adoptable and asking the court to consider the beneficial relationship exception of section 366.26, subdivision (c)(1)(B)(1).

The juvenile court found the children adoptable, observing they were "truly exceptional children," who were engaging and did "well in school in spite of what I believe to be rather gross and extensive neglect of their pretty basic needs."

---

[4] Lund also testified at the April 2015 hearing on mother's section 388 motion. At that time, she testified that she asked S.M. what it would take for her to want to return home with her mother. S.M. responded, " 'A lot would have to change.' "

The court then addressed the beneficial parental relationship exception urged by mother: "I don't believe that Mother has met her burden in terms of establishing that there is an exception to adoption that would apply in this case. [¶] The first prong is whether or not there's been regular visitation and contact. Mom has visited on a regular basis. Contact beyond those visits has been rather sporadic. But she has visited on a regular basis.

"But that's not the end of the inquiry. It's the benefit to the child of maintaining that parent-child relationship and whether those benefits outweigh adoption. And in this case, they simply do not. [¶] [S.M.] spent much of her life not in Mother's care but actually in her grandmother's care. . . . [¶] The portion of her life that she spent in Mother's care are some pretty horrific times. And really her basic human needs and the conditions that these children live in, no child should have to live like that. So I don't find anything with respect to that relationship and the extent of that relationship to be such to find that the Court should, rather than allow these children permanency and stability in a loving, safe, appropriate home, to be put on a back burner because there's some beneficial relationship here. There is not that sort of relationship in this case." The court further noted that the children shared a very close bond with each other and "to put them in different positions in terms of their legal standing and stability . . .would be highly detrimental."

The juvenile court terminated mother's parental rights to S.M., A.Z., and S.Z.

## DISCUSSION

The sole issue on appeal is mother's contention that the juvenile court erred in failing to find that she had established the beneficial parental relationship exception to adoption.

At a section 366.26 hearing, the juvenile court must select and implement a permanent plan for the dependent child. Where there is no probability of reunification with a parent, the preferred plan is adoption. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) "If the court determines . . . by a clear and convincing standard, that it is likely the

child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)[5]

Section 366.26, subdivision (c)(1)(B) sets forth exceptions to the preference for adoption if the court finds a "compelling reason" that termination of parental rights would be detrimental to the child. The exception at issue in this case applies if termination would be detrimental to the child because "[1] [t]he parents have maintained regular visitation and contact with the child and [2] the child would benefit from continuing the relationship" (the beneficial parental relationship exception). (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to show the applicability of a statutory exception to adoption. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

The beneficial parental relationship exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621, italics omitted.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the

---

[5] Mother does not challenge the juvenile court's finding that the children were adoptable within the meaning of section 366.26, subdivision (c)(1).

parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. [Citation.] While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

California courts are divided as to the correct standard of review of an order denying the applicability of an exception to termination of parental rights. Most courts have reviewed such an order for substantial evidence. (See, e.g., *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 & fn.4.) The abuse of discretion standard has also been applied. (See, e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Still other cases have blended these approaches based on the view that the beneficial parental relationship exception involves making two determinations, a factual one and a discretionary one. The first, whether a beneficial relationship exists, is a factual determination properly reviewed for substantial evidence. The second, whether that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)), requires the juvenile court to "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," and is appropriately reviewed for abuse of discretion. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We will apply this standard.

We have no difficulty concluding that substantial evidence supports the juvenile court's finding that mother failed to carry her burden of demonstrating a beneficial parental relationship. Here, both the social worker and the children's therapist found the children were not strongly bonded to mother. By the time of the section 366.26 hearing, mother did not always make an effort to contact the children, and the children were not asking about mother. There is evidence that mother's visits with the children went well

10

and the children expressed love for her, but mother must do more than show " 'frequent and loving contact,' " an "emotional bond with the child," or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) Instead, she must show that "he or she occupies a 'parental role' in the child's life." (*Ibid*.) Mother has failed to make such a showing.

Mother argues the fact the children are older is a compelling reason to maintain the parental relationship, but the age of the children alone is insufficient to establish a beneficial relationship as illustrated by this case. The oldest child, S.M., spent the majority of her life with grandmother, and the younger boys have repeatedly expressed their eagerness to be adopted.

Mother also points to Lund's testimony that it would be in the children's best interest to have an ongoing relationship with mother. This is not persuasive because Lund only meant that she believed open adoption is preferable to closed adoption in general.[6] At no time did Lund suggest that preserving the children's relationship with mother outweighed the benefits of adoption. To the contrary, Lund prepared the Bureau's addendum report, in which she wrote, "The children have no significant parent/child relationship which would outweigh the benefits of legal permanency for them," and at the hearing, she testified the children's therapist believed all three children were ready for adoption.

---

[6] Lund testified: "[M]y background in adoption is in . . . open adoptions. So . . . in general, I feel like it's in children's best interest to have the ability to have answers, if they so want them. [¶] In these particular children's lives, regardless of when [mother] has parented them, they know her as their mother. And so it's important that they are able to sustain some sort of connection, for when they do have questions that they're able to get those answers."

Mother asserts, "Once the legal parent-child relationship is permanently severed by termination of parental rights, a substantial positive emotional attachment between a child and a parent has no legal protection even if depriving the child of that attachment by disallowing contact would greatly harm the child." This may be a correct statement of the law, but it does nothing to show the children *in this case* have such "a significant, positive, emotional attachment" with mother worthy of protection. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Finally, mother's reliance on *In re Brandon C*. (1999) 71 Cal.App.4th 1530 is misplaced. In that case, twin boys were declared dependent children due to domestic violence and mother's substance abuse. At the section 366.26 hearing, the juvenile court ordered a permanent plan of guardianship, finding the boys would benefit from continuing their relationship with their mother. (*Id*. at pp. 1532–1533.) The Court of Appeal concluded there was sufficient evidence to support the finding of a beneficial parental relationship, noting the juvenile court "obviously credited the testimony from both mother and grandmother that there was a *close* bond between the mother and the boys, and that a continuation of contact would be beneficial to the children." (*Id.* at p. 1537, italics added.) There is no similar evidence of a close bond between mother and the children in this case. In any event, as respondent points out, the procedural posture of *Brandon C.* distinguishes it from the present case. The issue here is whether substantial evidence supports the juvenile court's contrary finding of *no* beneficial parental relationship. As we have described, the Bureau's reports and Lund's testimony provide such evidence.

## DISPOSITION

The orders of the juvenile court are affirmed.

 

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Richman, J.



A146807, *Contra Costa County Children & Family Services v. Jennifer Z.*